**FILED**
JUL 1 3 2011
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

SECURITIES AND EXCHANGE COMMISSION, )
100 F Street, N.E.
Washington, DC 20549

           **Plaintiff,**

v.

ARMOR HOLDINGS, INC.,

           **Defendant.**

Case: 1:11-cv-01271
Assigned To : Huvelle, Ellen S.
Assign. Date : 7/13/2011
Description: General Civil

**COMPLAINT**

---

Plaintiff, the United States Securities and Exchange Commission (the "Commission"), alleges as follows:

## SUMMARY

1. This action arises from violations by Defendant Armor Holdings, Inc. ("Armor Holdings") of the anti-bribery, books and records, and internal controls provisions of the Foreign Corrupt Practices Act ("FCPA"), as codified in the Securities Exchange Act of 1934 ("Exchange Act").

2. From 2001 through 2006, certain agents of Armor Holdings participated in a bribery scheme in which corrupt payments were authorized to be made to an official of the United Nations ("U.N."), for the purpose of obtaining and retaining U.N. business.

3. Armor Holdings generated more than $7.1 million in improper revenues, and realized over $1.5 million in improper profits, through the award of U.N. body armor contracts to its subsidiary during this period.

4. From 2001 through June 2007, another Armor Holdings subsidiary employed an accounting practice that disguised in its books and records approximately

$4,371,278 in commissions paid to intermediaries who brokered the sale of goods to foreign governments.

5. By virtue of this conduct, Armor Holdings violated the anti-bribery, books and records, and internal controls provisions of the FCPA and the Exchange Act.

## JURISDICTION

6. The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. Defendant, directly or indirectly, made use of the mails and/or the means and instrumentalities of interstate commerce in connection with the conduct described in this Complaint.

7. Venue is appropriate in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Armor Holdings, as a U.S. issuer, filed required periodic reports with the Commission in this judicial district.

## DEFENDANT

8. **Armor Holdings, Inc.**, during the relevant period, was a Delaware corporation, headquartered in Jacksonville, Florida, whose operating subsidiaries specialized in the manufacture and sale of military, law enforcement, and personnel safety equipment. During the relevant period, the company's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act, and listed on the New York Stock Exchange. On July 31, 2007, after the conduct described in this Complaint had already occurred, Armor Holdings was acquired by BAE Systems, Inc. – an indirect wholly-owned U.S. subsidiary of Britain's BAE Systems PLC. Accordingly, Armor Holdings is no longer registered as an issuer of securities.

## RELEVANT ENTITIES

9.  **Armor Holdings Products, LLC** ("AHP"), during the relevant period, was a Delaware limited liability company headquartered in Jacksonville, Florida. AHP, a wholly-owned subsidiary of Armor Holdings, was listed in public filings as one of three reportable business divisions in which Armor Holdings was organized.

10. **Armor Products International, Ltd.** ("API"), during the relevant period, was a wholly-owned U.K. subsidiary of AHP. API's financial results were consolidated into AHP's financial statements which, in turn, were consolidated within the financial statements of Armor Holdings.

## FACTUAL BACKGROUND

### U.N. Bribery Scheme

11. Beginning in at least 2001, an AHP vice president and an API senior officer, agents of Armor Holdings, participated in a scheme to help API obtain contracts for the supply of body armor to be used in U.N. peacekeeping missions.

12. These agents of Armor Holdings caused API to enter into a sham consulting agreement with a third-party intermediary for purportedly legitimate services in connection with the sale of goods to the U.N. API agreed to pay the intermediary a success fee in the form of a percentage of value of any contract obtained from the U.N.

13. Between 2001 and 2006, API received various invoices from the third-party intermediary. The intermediary charged API inflated or illegitimate commissions for its purported consulting services – reaching as high as twenty percent of the amount to be earned on the original contract.

14. Agents of Armor Holdings knew or consciously disregarded that some portion of these commissions would be offered to a U.N. official. In September 2001, the third-party intermediary instructed API to provide a signed, but otherwise blank, pricing sheet that the intermediary would complete after learning from a U.N. procurement official about non-public bids submitted by competitors for the contract.

15. In late September 2001, the third-party intermediary obtained a confidential internal U.N. memorandum recommending that API be awarded the contract. The intermediary immediately emailed this internal U.N. document to an agent of Armor Holdings – advising him to "PLEASE DESTROY AFTER READING."

16. In October 2001, the U.N. awarded API a multi-year contract for the supply of body armor. API's ability to secure this business was facilitated by the intermediary's inside access within the U.N. procurement system.

17. In February 2003, an AHP vice president asked the third-party intermediary how API could win a renewal contract to sell body armor to the U.N. The intermediary responded that the same rules would apply to the 2003 tender as applied to the 2001 tender. In August 2003, API received another three-year contract from the U.N.

18. In 2006, API received an additional one-year supply extension from the U.N., without further assistance from the third-party intermediary. Such an extension was contemplated by the 2003 contract.

19. By late 2006, API had made at least ninety-two payments to the U.N. intermediary, totaling approximately $222,750. Agents of Armor Holdings caused API to wire payments to the intermediary with the understanding that part of these payments would be offered to a U.N. official who could help steer business to API.

20. From the 2001 and 2003 U.N. body armor contracts – together with the one-year extension granted in 2006 – Armor Holdings derived gross revenues of approximately $7,121,237, and net profits of approximately $1,552,306.

### "Distributor Net" Accounting Disguised Sales Commissions

21. From in or around 2001 through June 2007, AHP also employed a separate accounting practice – hereinafter described as "distributor net" – that disguised in the books and records of Armor Holdings roughly $4,371,278 in commissions paid to third-party intermediaries who brokered the sale of goods to foreign governments.

22. Since the sales intermediaries never obtained title over the goods, and AHP retained the risks and rewards of ownership prior to delivery, U.S. Generally Accepted Accounting Principles ("GAAP") required AHP to record sales to foreign governments at the full or "gross" sales price – with a separate display of any commission expense for amounts paid to an intermediary. Instead, however, AHP adopted the "distributor net" accounting practice which disguised certain commission payments to sales intermediaries in the books and records of Armor Holdings.

23. In a typical "distributor net" transaction, AHP sent the foreign-government customer a "gross" invoice – including the sales price of goods sold, plus commission – while internally recording sales at a "net" amount that did not include the commission due to the third-party sales intermediary. Thus, amounts received from the customer would be greater than the amount booked internally for a sale, resulting in a credit balance in the customer's account receivable.

24. AHP would then transfer the "overpayment" through a series of non-commission accounts before ultimately disbursing it to the third-party sales intermediary.

These payments to sales intermediaries under "distributor net" accounting were never recorded as a commission expense on the books and records of Armor Holdings.

25.  The largest "distributor net" deal involved a sale of body armor vests to the Iraqi government. In this 2005 transaction, an Armor Holdings subsidiary submitted "gross" invoices totaling $3,364,532 through an intermediary in the U.K. Rather than record the transaction at the "gross" amount, AHP booked the sales and accounts receivable at the "net" amount of $2,220,000. AHP then recorded much of the $1,144,532 "overpayment" in unrelated accounts before disbursing commissions to two sales intermediaries. The effect of "distributor net" accounting for this transaction was to conceal over $1 million in commissions on the books and records of Armor Holdings.

26.  Armor Holdings was on notice that AHP's "distributor net" accounting was improper. For example, on March 12, 2001, Armor Holdings' outside auditor emailed comments to certain senior officers, indicating that the "distributor net" practice understated accrued liabilities and accounts receivable, and that the company should record a receivable for the gross amount due, together with an accrual for commissions.

27.  Subsequently, on September 22, 2005, the comptroller of another Armor Holdings subsidiary who had refused to implement "distributor net" at his division advised senior officials at AHP and Armor Holdings of his concern that such accounting was "blown out of the water" by GAAP. Because AHP acted as a manufacturer rather than a distributor, the comptroller believed "it would be wholly inappropriate, based on the guidance in EITF [Emerging Issues Task Force] 99-19 to record the revenues net."

28.  Despite these admonitions, AHP continued to employ "distributor net" accounting through June 2007.

29. AHP used "distributor net" accounting in at least 92 transactions from 2001 through June 2007 – resulting in approximately $4,371,278 of undisclosed commissions on the books and records of Armor Holdings, and rendering those books and records inaccurate.

## FIRST CAUSE OF ACTION

### Violation of Section 30A of the Exchange Act

30. Paragraphs 1 through 20 are re-alleged and incorporated by reference.

31. Armor Holdings, through its agents, made use of the mails or means or instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of money, or offer, gift, promise to give, or authorization of the giving of value to any person, while knowing that all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to foreign officials for the purposes of influencing acts or decisions in their official capacities; inducing them to do or omit to do acts in violation of their lawful duties; securing an improper advantage; or inducing such foreign officials to use their influence with a foreign government or instrumentality to assist Armor Holdings in obtaining or retaining business for or with, or directing business to, any person.

32. By reason of the foregoing, Armor Holdings violated Section 30A of the Exchange Act [15 U.S.C. § 78dd-1].

## SECOND CAUSE OF ACTION

### Violation of Section 13(b)(2)(A) of the Exchange Act

33. Paragraphs 1 through 29 are re-alleged and incorporated by reference.

34. Armor Holdings failed to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of assets.

35. By reason of the foregoing, Armor Holdings violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## THIRD CAUSE OF ACTION

### Violation of Section 13(b)(2)(B) of the Exchange Act

36. Paragraphs 1 through 29 are re-alleged and incorporated by reference.

37. Armor Holdings failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; and (ii) transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles, and to maintain accountability for assets.

38. By reason of the foregoing, Armor Holdings violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## REQUEST FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter a final judgment that:

A. permanently restrains and enjoins Defendant Armor Holdings from violating Sections 30A, 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C §§ 78dd-1, 78m(b)(2)(A), and 78m(b)(2)(B)];

    B.    requires Defendant Armor Holdings to disgorge any ill-gotten gains, plus prejudgment interest thereon;

    C.    orders Defendant Armor Holdings to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

    D.    orders Defendant to comply with certain undertakings concerning its Foreign Corrupt Practices Act compliance program; and

    E.    grants such further relief as the Court may deem just and proper.

Dated:

    Respectfully submitted,

*/s/ Gerald W. Hodgkins*
Gerald W. Hodgkins (D.C. Bar No. 447678)
Gregory G. Faragasso
Richard J. Kutchey

Attorneys for Plaintiff,
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-6010
Telephone: (202) 551-4719 (Hodgkins)
Facsimile: (202) 772-9366
Email: hodgkinsg@sec.gov