# Exhibit 1

WILMERHALE

April 24, 2012

**Kimberly A. Parker**
Partner

+1 202 663 6987(t)
+1 202 663 6363(f)
kimberly.parker@wilmerhale.com

By Hand

The Honorable Richard J. Leon
U.S. District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re:     **SEC v. Armor Holdings, Inc., 11-cv-1271, FILED UNDER SEAL**

Dear Judge Leon:

In advance of the hearing the Court has requested for this matter, in connection with the revised proposed Final Consent Judgment ("Final Judgment") to be filed shortly, enclosed please find a proposed Notification of Successor and Adoption of Final Consent Judgment (attached as Exhibit A) for your consideration.

We respectfully submit this letter, following consultation with the Securities and Exchange Commission ("SEC"), to explain how the proposed Final Judgment and the Notification we are submitting herewith (a) address the objectives the Court set during our conference in Chambers on February 28, 2012; and (b) deal with the pending sale of a relevant business unit of Armor Holdings, Inc. ("Armor") in a manner that makes both the settling defendant, Armor, and the acquirer fully subject to the prospective provisions of the Final Judgment.

First, BAE Systems, Inc. ("BAE") is in the final stages of selling an Armor business unit called Safariland LLC (formerly known as the Armor Holdings Products Group, LLC ("AHP")). AHP was the business segment of Armor where Richard Bistrong was employed and where a significant portion of the conduct alleged in the SEC's Complaint took place. BAE will not retain any part of AHP following the sale of Safariland. We have informed the SEC of this pending sale and we have conferred with the SEC regarding the approach taken in the attached documents.

BAE, Armor, and the SEC agree that there should be continued oversight of the former AHP entity by this Court and the SEC following this sale. For this reason, we have added language to the proposed Final Judgment that makes explicit the obligations of the buyer under the Final Judgment:

- Paragraph 18 states that any acquirer or successor entity of AHP will be subject to and required to comply with all terms of the Final Judgment and will be required, as part of the sale, to explicitly adopt the Final Judgment, acknowledge this Court's jurisdiction over the acquirer/successor, and acknowledge the acquirer/successor's obligation to comply with its terms.

WILMERHALE

Honorable Judge Leon
April 24, 2012
Page 2

- Paragraph 19 provides that any acquirer/successor of AHP will be responsible for filing with this Court and the SEC the compliance reports with respect to AHP required by the Final Judgment (as described in Paragraph 15).

- Paragraph 20 states that the acquirer/successor of AHP will be responsible for making the required notifications with respect to AHP to this Court and the SEC (as described in Paragraph 16).

- Paragraph 21 provides that Armor will remain responsible for submitting the compliance reports and notifications required by Paragraphs 15 and 16 as to any Legacy Armor Operations that it continues to own.

In addition, we have prepared a proposed Notification of Successor and Adoption of Final Consent Judgment, which the acquirer/successor of AHP will execute and file with this Court following the entry of the Final Consent Judgment. This Notification makes clear that the acquirer/successor of AHP will assume all of the obligations under the Final Judgment with respect to AHP, including being bound by the permanent injunction, meeting the corporate compliance program requirements, as well as the reporting and notification obligations described above.

With these modifications, the Final Judgment and the proposed Notification/Adoption document make clear that both the buyer and Armor will be bound by all of the terms of the Final Judgment with respect to businesses that they continue to own which were part of the legacy Armor operations.

Second, we have added language to this Final Judgment (in Paragraph 15) that sets out a schedule for Armor to file reports with this Court that is coextensive with Armor's reporting schedule to the SEC and to the Department of Justice ("DOJ"). The SEC previously agreed that Armor could meet its compliance reporting obligations by submitting the same reports on the same schedule to both DOJ and SEC. The first such report was submitted by BAE on behalf of Armor to both the DOJ and the SEC on January 9, 2012. Armor is due to provide two additional compliance reports on July 16, 2012 and January 2, 2013.

As discussed above, the buyer of Safariland/AHP will also be required to file compliance reports, but the schedule for such reports is set forth in Paragraph 19 of the Final Judgment.

Third, in Paragraph 16, we inserted language requiring that, for the duration of the reporting period (which, pursuant to Armor's previous agreement with the SEC, runs through May 5, 2013), Armor must notify this Court and the SEC within 30 days of learning of:

WILMERHALE

Honorable Judge Leon
April 24, 2012
Page 3

1.  That it is reasonably likely that Armor or any Legacy Armor Operation or any of their officers, directors, employees or agents acting on its behalf has violated the FCPA

2.  That Armor or any Legacy Armor Operation is the subject of any investigation or enforcement proceeding by any government agency related to FCPA violations

3.  Of any criminal conduct by, or criminal investigations of, Armor and all Legacy Armor Operations and any of their senior managerial employees that comes to the attention of Armor or its senior management; and

4.  Of any administrative proceeding or civil action brought by any governmental authority that alleges fraud by or against Armor or Legacy Armor Operations.

This proposed language directly – and, we think, appropriately – tracks the notification language in the non-prosecution agreement that Armor signed with DOJ last year (a copy of which is attached to this letter as Exhibit B). We believe that this language addresses this Court's requirement that Armor keep this Court and the SEC apprised of any FCPA-related or criminal conduct, investigations, or proceedings, as well as any related civil matters.

As discussed above, the buyer of Safariland/AHP will be fully subject to these provisions.

Fourth and finally, we added language (Paragraph 17) to the proposed Final Judgment that specifies that all reports or notifications to this Court pursuant to Paragraphs 15 or 16 will be made under seal. The corporate compliance reports that Armor has prepared to date for DOJ and SEC, which Armor will also be filing with this Court, contain confidential business information relating to the way the company conducts business, how it engages its business partners, and its compliance program. As a rule, DOJ and SEC do not make these types of compliance reports public. Similarly, there may be sound law enforcement reasons for not making public any notification by Armor of criminal investigations, criminal conduct, FCPA violations, or fraud-related allegations at least such time as disclosure is required for law enforcement purposes or other reasons such as relevant investor disclosure requirements. Paragraph 17 would apply to the buyer of Safariland/AHP as well.

As requested by the Court on February 28, a representative of Armor will be available to appear at the Court's earliest convenience so that the Final Consent Judgment can be entered expeditiously.

WILMERHALE

Honorable Judge Leon
April 24, 2012
Page 4

Respectfully Submitted,

*Kimberly A. Parker /⊕*

Kimberly A. Parker

cc:    Sarah Levine, Securities and Exchange Commission
       Richard Kutchey, Securities and Exchange Commission

# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. 11-cv-1271<br>Hon. Richard J. Leon |
| ARMOR HOLDINGS, INC., | **FILED UNDER SEAL** |
| Defendant. | |

**NOTIFICATION OF SUCCESSOR AND ADOPTION OF FINAL CONSENT**
**JUDGMENT**

On _____, this Court entered a Final Consent Judgment in the matter of U.S. Securities and Exchange Commission v. Armor Holdings, Inc. (Case No. 11-cv-1271) (the "Final Judgment"), which requires that "[i]n the event that Armor sells or transfers Armor Holdings Products, LLC (now known as Safariland, LLC) and/or any subsidiaries thereof (hereinafter, collectively, 'AHP'), the acquirer or successor entity of AHP (such entity, the 'Acquirer') shall be subject to and required to comply with all terms of [the] Final Judgment."  Having entered a general appearance and consented to the Court's jurisdiction over it for purposes of the Final Judgment, [BUYER], as the Acquirer of AHP, hereby adopts the Final Judgment and acknowledges its obligation and intention to comply with the terms, including the permanent injunction described in Sections I, II, and III and all of the obligations described in Section V thereof, in each case solely with respect to AHP and modified as follows.

Specifically:

1.   [BUYER] agrees that AHP (also referred to herein as the "Company") and AHP's

officers, agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of the Final Judgment by personal

service or otherwise are permanently restrained and enjoined from violating, directly or

indirectly, Section 30A of the Securities Exchange Act of 1934 ("Exchange Act") [15

U.S.C. § 78dd-l] by use of the mails or any means or instrumentality of interstate

commerce corruptly in furtherance of any offer, payment, promise to pay, or

authorization of the payment of any money, or offer, gift, promise to give, or

authorization of the giving of anything of value to—

   (1) any foreign official for purposes of—

      (A)(i) influencing any act or decision of such foreign official in his official
      capacity, (ii) inducing such foreign official to do or omit to do any act in violation
      of the lawful duty of such official, or (iii) securing any improper advantage; or
      (B) inducing such foreign official to use his influence with a foreign government
      or instrumentality thereof to affect or influence any act or decision of such
      government or instrumentality,

   in order to assist the Company in obtaining or retaining business for or with, or
   directing business to, any person;

   (2) any foreign political party or official thereof or any candidate for foreign political
   office for purposes of—

      (A)(i) influencing any act or decision of such party, official, or candidate in its or
      his official capacity, (ii) inducing such party, official, or candidate to do or omit
      to do an act in violation of the lawful duty of such party, official, or candidate, or
      (iii) securing any improper advantage; or (B) inducing such party, official, or
      candidate to use its or his influence with a foreign government or instrumentality
      thereof to affect or influence any act or decision of such government or
      instrumentality,

   in order to assist the Company in obtaining or retaining business for or with, or
   directing business to, any person; or

   (3) any person, while knowing that all or a portion of such money or thing of value
   will be offered, given, or promised, directly or indirectly, to any foreign official, to

any foreign political party or official thereof, or to any candidate for foreign political office for purposes of—

(A)(i) influencing any act or decision of such foreign official, political party, party official, or candidate in his or its official capacity, (ii) inducing such foreign official, political party, party official, or candidate to do or omit to do any act in violation of the lawful duty of such foreign official, political party, party official, or candidate, or (iii) securing any improper advantage; or (B) inducing such foreign official, political party, party official, or candidate to use his or its influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,

in order to assist the Company in obtaining or retaining business for or with, or directing business to, any person.

2.     [BUYER] agrees that AHP and AHP's officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), by failing to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company.

3.     [BUYER] agrees that AHP and AHP's officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B), by failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable

to such statements, and to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

4.     [BUYER] agrees to implement the compliance undertakings referenced in Section V of the Final Judgment at AHP, modified as follows:

(1)     AHP will continue to conduct appropriate reviews of its existing internal controls, policies, and procedures.

(2)     Where appropriate, AHP agrees to adopt new or to modify existing internal controls, policies, and procedures in order to ensure that it maintains:  (a) a system of internal accounting controls designed to ensure that AHP makes and keep fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance code, standards, and procedures designed to detect and deter violations of the FCPA and other applicable anti-corruption laws.  At a minimum, this should include, but not be limited to, the following elements:

(a)     AHP will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA, including its anti-bribery, books and records, and internal controls provisions, and other applicable foreign law counterparts (collectively, the "anti-corruption laws"), which policy shall be memorialized in a written compliance code.

(b)     AHP will ensure that its senior management provides strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws and its compliance code.

(c)     AHP will develop and promulgate compliance standards and procedures designed to reduce the prospect of violations of the anti-corruption laws and its compliance code, and AHP will take appropriate measures to encourage and support the observance of ethics and compliance standards and procedures against foreign bribery by personnel at all levels of the Company.  These anti-corruption standards and procedures shall apply to all directors, officers, and employees of AHP and, where necessary and appropriate, outside parties acting on behalf of AHP in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners"), to the extent that agents and business partners may be employed under AHP's corporate policy.  AHP shall notify all employees that compliance with the standards and procedures is the duty of individuals at all levels of the Company.  Such standards and procedures shall include policies governing:

    (i) gifts;

    (ii) hospitality, entertainment, and expenses;

    (iii) customer travel;

    (iv) political contributions;

    (v) charitable donations and sponsorships;

    (vi) facilitation payments; and

    (vii) solicitation and extortion.

- 5 -

(d)     AHP will develop these compliance standards and procedures, including internal controls, ethics, and compliance programs on the basis of a risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

(e)     AHP shall review its anti-corruption compliance standards and procedures, including internal controls, ethics, and compliance programs, no less than annually, and update them as appropriate, taking into account relevant developments in the field and evolving international and industry standards, and update and adapt them as necessary to ensure their continued effectiveness.

(f)     AHP will assign responsibility to one or more senior corporate executives, reporting to [BUYER's] board of directors or committee thereof, for the implementation and oversight of its anti-corruption policies, standards, and procedures.  Such corporate official(s) shall have direct reporting obligations to independent monitoring bodies, including internal audit, [BUYER's] board of directors, or any appropriate committee thereof, and

shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

(g)    AHP will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts to ensure that they cannot be used for the purpose of foreign bribery or concealing such bribery.

(h)    AHP will implement mechanisms designed to ensure that its anti-corruption policies, standards, and procedures are effectively communicated to all directors, officers, and employees, and, where appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers and, where necessary and appropriate, employees, agents and business partners; and (b) annual certifications by all such directors and officers and, where necessary and appropriate, employees, agents, and business partners, certifying compliance with the training requirements.

(i)    AHP will establish an effective system for:

(i)    Providing guidance and advice to directors, officers, and employees of AHP, and, where appropriate, agents and business partners of AHP, on complying with the Company's anti-corruption compliance policies, standards, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates;

- 7 -

(ii)     Internal and, where possible, confidential reporting by, and protection of, directors, officers, and employees of AHP, and, where appropriate, agents and business partners of AHP, not willing to violate professional standards or ethics under instructions or pressure from hierarchical superiors, as well as for directors, officers, and employees of AHP, and, where appropriate, agents and business partners of AHP, willing to report breaches of the law or professional standards or ethics concerning anti-corruption occurring within the Company, suspected criminal conduct, and/or violations of the compliance policies, standards, and procedures regarding the anti-corruption laws for directors, officers, and employees of AHP, and, where appropriate, agents and business partners of AHP; and

(iii)    Responding to such requests and undertaking appropriate action in response to such reports.

(j)     AHP will institute appropriate disciplinary procedures to address, among other things, violations of anti-corruption laws and the Company's anti-corruption policies and procedures by directors, officers, and employees of AHP.  AHP shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal

controls, ethics, and compliance program and making modifications necessary to ensure the program is effective.

(k)     AHP will institute appropriate due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

(i)     Properly documented risk-based due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners of AHP;

(ii)    Informing agents and business partners of AHP's commitment to abiding by laws on the prohibitions against foreign bribery, and of AHP's ethics and compliance standards and procedures and other measures for preventing and detecting such bribery; and

(iii)   Seeking a reciprocal commitment from agents and business partners.

(l)     Where appropriate, AHP will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include:  (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a

result of any breach of anti-corruption laws, and regulations or

representations and undertakings related to such matters.

(m)    AHP will conduct periodic reviews and testing of the application of the

Company's compliance code and of the Company's standards and

procedures designed to evaluate and improve their effectiveness in

preventing and detecting violations of anti-corruption laws and the

Company's standards and procedures, taking into account relevant

developments in the field and evolving international and industry

standards.

5.    In accordance with Paragraph 19 of the Final Judgment, [BUYER] agrees that AHP will

file compliance reports as follows:

(a)    The first report shall be due within 180 days of the closing of the sale.

(b)    The second report shall be due 180 days after the filing of the first report.

(c)    The reports shall be filed, under seal, with the U.S. District Court for the

District of Columbia and transmitted to Gregory G. Faragasso, Assistant Director,

U.S. Securities and Exchange Commission, 100 F Street, N.E., Washington, D.C.,

20549-6010.

(d)    [BUYER] may extend the time period for issuance of the reports required by

Paragraph 19 with prior written approval from the SEC and notice to this Court.

6.    [BUYER] agrees that AHP will file notifications with the SEC and this Court as required

by Paragraph 20 of the Final Judgment.

7.    [BUYER] agrees that in accordance with the terms of the Final Judgment, it is hereby

solely responsible for complying with the obligations of the Final Judgment with respect

to AHP.  [BUYER] shall not be responsible for complying with the obligations of Section

IV of the Final Judgment.

8.      [BUYER] agrees that this Court shall retain jurisdiction over this matter for the purpose

of enforcing the terms of the Final Judgment and this Notification of Successor and

Adoption of Final Consent Judgment.


Dated: _____


                                        [BUYER]

                                        By:

                                        _____

                                        Name of person signing for entity

                                        Title:

                                        Address:


                                        Armor Holdings Products, LLC

                                        By:

                                        _____

                                        Name of person signing for entity

                                        Title:

                                        Address:


                                        Armor Holdings, Inc.

                                        By:

                                        _____

- 11 -

Name of person signing for entity

Title:

Address:

On _____, 2012, _____, a person known to me, personally appeared before me and acknowledged executing the foregoing Notification of Successor and Adoption of Final Consent Judgment with full authority to do so on behalf of [BUYER] as its _____.

Notary Public:

Commission Expires:

On _____, 2012, _____, a person known to me, personally appeared before me and acknowledged executing the foregoing Notification of Successor and Adoption of Final Consent Judgment with full authority to do so on behalf of Armor Holdings Products, LLC as its _____.

Notary Public:

Commission Expires:

Approved as to form:

_____

[BUYER's COUNSEL]

Counsel for [Buyer]

Approved as to form:

_____

Counsel for Armor Holdings Products, LLC

(now known as Safariland, LLC)


Approved as to form:


_____

Counsel for Armor Holdings, Inc.

# Exhibit B



**U.S. Department of Justice**

Criminal Division

July 13, 2011

Roger M. Witten
Kimberly A. Parker
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue New York, NY 10022

Re:   **Armor Holdings, Inc.**

Dear Counsel:

On the understandings specified below, the United States Department of Justice, Criminal Division, Fraud Section ("this Office") will not criminally prosecute Armor Holdings, Inc., or any of its present or former parents, subsidiaries, or affiliates for any crimes (except for criminal tax violations, as to which this Office cannot and does not make any agreement) related to the making of, and agreement to make, improper payments by Armor employees and agents to a procurement official of the United Nations ("U.N.") in connection with efforts to obtain and retain body armor contracts for an Armor subsidiary from the U.N. in 2001 and 2003, and related accounting and record-keeping associated with these improper payments, as well as other improper  accounting and record-keeping conduct described in Appendix A hereto, which is incorporated by reference herein.  This non-prosecution agreement applies to Armor Holdings, Inc. and any Armor entity that is directly or indirectly owned by BAE Systems, Inc. as of the date of this Agreement ("Legacy Armor Operations"), including Armor Holdings Products LLC and Armor Products International Ltd. (collectively, "Armor"), and, where and to the extent specified below, to BAE Systems, Inc. ("BAE Systems") and its affiliates.

This Office enters into this non-prosecution agreement based, in part, on the following factors: (a) Armor's complete disclosure of the facts described in Appendix A; (b) Armor's self-investigation and cooperation with this Office and the U.S. Securities and Exchange Commission ("SEC"); (c) the fact that all of the conduct described in Attachment A took place prior to the acquisition of Armor by BAE Systems, Inc.; and (d) the extensive remedial efforts undertaken by Armor, before and after Armor's acquisition by BAE Systems, Inc., including but not limited to terminating the Armor employees who were involved in the misconduct; terminating approximately 1,700 international sales representatives and distributors of Armor Holdings Products LLC immediately after the acquisition closed; conducting extensive FCPA compliance training for over 1,000 Armor employees; implementing BAE Systems' due diligence protocols and review processes for any new Armor foreign sales representatives and distributors; and applying BAE Systems' compliance policies and internal controls to all Armor businesses.

It is understood that Armor admits, accepts, and acknowledges responsibility for the conduct set forth in Appendix A and agrees not to make any public statement contradicting Appendix A.

If Armor fully complies with the understandings specified in this non-prosecution agreement, including Appendix B hereto (collectively referred to as the "Agreement"), this Office will not bring any criminal case against Armor based on the conduct of present and former officers, directors, employees, agents, consultants, contractors and subcontractors, as described in Appendix A, or conduct Armor specifically disclosed to the Office in meetings during its voluntary disclosure from March 2007 to December 2010. This non-prosecution agreement, including Appendix B hereto (collectively referred to as the "Agreement"), does not provide any protection against prosecution for any crimes except as set forth above, and applies only to Armor and its present or former parents and affiliates, and not to any other entities except as set forth in this Agreement or to any individuals. Armor expressly understands that the protections provided under this Agreement shall not apply to any acquirer or successor entities of Armor (other than BAE Systems Inc. and its parents, subsidiaries, and affiliates) unless and until such acquirer or successor formally adopts and executes this Agreement, at which time the acquirer or successor entity shall become solely responsible for the obligations of this Agreement with respect to such acquired business. This paragraph does not provide any protections against prosecution for any violations of U.S. criminal law if made in the future by Armor, or any of its then parents, subsidiaries, affiliates, directors, employees, agents or consultants, whether or not disclosed by Armor pursuant to the terms of this agreement. This agreement will not close or preclude the investigation or prosecution of any natural persons, including any current or former officers, directors, employees, stockholders, consultants or agents of Armor, who may have been involved in any of the matters set forth in the accompanying Appendix A or in any other matters.

This Agreement shall have a term of two years from the date of this agreement except as specifically provided in the following paragraph. It is understood that for the two-year term of this Agreement, Armor shall: (a) commit no crimes whatsoever; (b) truthfully and completely disclose non-privileged information with respect to the operations and personnel of all Legacy Armor Operations concerning all matters about which this Office inquires of it, which information can be used for any purpose, except as otherwise limited in this Agreement; and (c) bring to this Office's attention all criminal conduct by, or criminal investigations of, Armor and all Legacy Armor Operations and any of their senior managerial employees, that comes to the attention of Armor or its senior management, as well as any administrative proceeding or civil action brought by any governmental authority that alleges fraud by or against Armor or Legacy Armor Operations.

Until the date upon which all investigations and prosecutions arising out of the conduct described in this Agreement, including Appendix A, the conduct otherwise disclosed to this Office, or conduct related to violations by Armor of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 et seq. ("FCPA") are concluded, whether or not they are concluded within the two-year term specified in the preceding paragraph, Armor shall: (a) cooperate fully with this Office, the Federal Bureau of Investigation, the SEC, and any other law enforcement agency designated by this Office; (b) assist this Office in any investigation or prosecution arising out of the conduct described in this Agreement, including Appendix A, the conduct otherwise disclosed to this Office, or conduct related to violations by Armor of the FCPA by providing logistical and technical support for any meeting, interview, grand jury proceeding, or any trial or other court proceeding; (c) use its best efforts promptly to secure the attendance and truthful statements or testimony of any officer, agent, or employee at any meeting or interview or before the grand jury or at any trial or other court proceeding related to the conduct described in this Agreement,

including Appendix A, or the conduct otherwise disclosed to this Office; and (d) provide this Office, upon request, all non-privileged information, documents, records, or other tangible evidence about which this Office or any designated law enforcement agency inquires in connection with any investigation or matter related to the conduct described in this Agreement, including Appendix A, the conduct otherwise disclosed to this Office, or conduct related to violations of the FCPA.

It is understood that Armor agrees to pay a monetary penalty of $10,290,000. Armor must pay this sum to the United States Treasury within ten days of executing this Agreement. Armor acknowledges that no tax deduction may be sought in connection with this payment.

It is understood that Armor and all Legacy Armor Operations will continue to maintain (or adopt and implement, if necessary) the compliance, bookkeeping, and internal controls standards and procedures, at least as fulsome as set forth in Appendix B. It is further understood that Armor will report periodically to this Office regarding its compliance with this Agreement, as set forth in Appendix C.

It is understood that, should Armor or any Legacy Armor Operations commit any crimes subsequent to the date of signing of this Agreement, or should it be determined that Armor has given false, incomplete, or misleading testimony or information at any time in connection with this Agreement, the investigation or disclosures that led to this Agreement or Armor's performance of this Agreement, or should Armor otherwise violate any provision of this Agreement, Armor shall thereafter be subject to prosecution for any violation of which this Office has knowledge, including perjury and obstruction of justice. Any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against Armor, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecution. It is the intent of this Agreement for Armor to waive all defenses based on the statute of limitations with respect to any such prosecution that is not time-barred on the date that this Agreement is signed.

It is understood that, if this Office determines that Armor has committed any crime after signing this Agreement, or that Armor has given false, incomplete, or misleading testimony, or has otherwise violated any provision of this Agreement: (a) all statements made by Armor to this Office or other designated law enforcement agents and any testimony given by Armor before a grand jury or other tribunal, whether prior or subsequent to the signing of this Agreement, and any leads from such statements or testimony, shall be admissible in evidence in any criminal proceeding brought against Armor; and (b) Armor shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed. By signing this Agreement, Armor waives all rights in the foregoing respects.

It is further understood that this Agreement does not bind any federal, state, local, or foreign prosecuting authority other than this Office. This Office will, however, bring the cooperation of Armor to the attention of other prosecuting and investigative offices, if requested by Armor.

It is further understood that Armor and this Office may disclose this Agreement to the public.

With respect to this matter, from the date of execution of this Agreement forward, this Agreement supersedes all prior, if any, understandings, promises, and/or conditions between this Office and Armor. No additional promises, agreements, or conditions have been entered into other than those set forth in this Agreement and none will be entered into unless in writing and signed by all parties.

Sincerely,

DENIS J. MCINERNEY
Chief, Fraud Section

By: _____

Charles E. Duross
Deputy Chief, Fraud Section
Laura N. Perkins
Trial Attorney, Fraud Section

AGREED AND CONSENTED TO:

Armor Holdings, Inc.

By: _____     7·13·11

Ian T. Graham                    Date

APPROVED:

By: _____     July 13, 2011

Roger M. Witten                  Date
Kimberly A. Parker
Wilmer Cutler Pickering Hale and Dorr LLP
Attorneys for Armor Holdings, Inc.

## APPENDIX A

## STATEMENT OF FACTS

This Statement of Facts is incorporated by reference as part of the non-prosecution agreement, dated July 13, 2011, between the United States Department of Justice, Criminal Division, Fraud Section ("this Office") and Armor Holdings, Inc. ("Armor"). The United States and Armor agree that the following facts are true and correct:

### I.   Background

1.     Armor, a Delaware corporation, was headquartered in Jacksonville, Florida, and, until its acquisition by BAE Systems, Inc., on or about July 31, 2007, was listed as a public company on the New York Stock Exchange. Armor maintained a class of securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) and was required to file reports with the United States Securities and Exchange Commission under Section 13 of the Securities Exchange Act (15 U.S.C. § 78m). Accordingly, until its acquisition by BAE Systems, Inc., Armor was an "issuer" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15 United States Code, Section 78dd-1. Armor manufactured security products, vehicle armor systems, protective equipment and other products for use, primarily, by military, law enforcement, security and corrections personnel.

2.     Armor Holdings Products Group (the "Products Group") was a wholly owned division of Armor that manufactured and sold a variety of military and law enforcement equipment such as body armor, holsters, anti-riot products, pepper spray, police batons and weapon maintenance products. The Products Group operated throughout most of the world and had a presence in the United States, the United Kingdom, Mexico, Switzerland, and Hong Kong.

3.      Richard Bistrong ("Bistrong"), a citizen of the United States, was the Product Group's Vice President for International Sales and maintained some responsibility for international sales in Armor's commercial armored vehicles division.

4.      "Subsidiary Executive A," a citizen of the United Kingdom, was the managing director of Armor Products International Ltd. ("API"), a wholly owned subsidiary of Armor that was a part of the Products Group and headquartered in the United Kingdom.  API manufactured and sold protective gear such as ballistic helmets and armored vests.

5.      The United Nations ("U.N.") is an organization designated by the President by Executive Order for the purposes of the FCPA, and as such, it is a public international organization for the purposes of the FCPA.

6.      "U.N. Agent" was an independent sales agent API used to assist it in winning contract tenders for body armor with the U.N.  As part of API's financial arrangement with the U.N. Agent, API agreed to pay the U.N. Agent a success fee in the form of a percentage of the value of any contract with the U.N. that the U.N. Agent assisted API in obtaining.

7.      "Products Employee A," a United States citizen, was a senior employee in the Products Group's finance department.

## II.    **The Improper Conduct**

*The United Nations*

8.      From in or around September 2001 through in or around 2006, API and its employees and agents made corrupt payments to a United Nations procurement official to induce that official to provide non-public, inside information to API, and to cause the U.N. to award body armor contracts to API.  Armor employees falsely recorded the nature and purpose of these improper payments, as well as other payments, in Armor's books and records.

- 2 -

9.     In or around January 2001, Bistrong and Subsidiary Executive A, on behalf of
API, retained the U.N. Agent to assist API in obtaining contracts to supply goods to the U.N.

10.    In or around September 2001, the U.N. published a Request for Proposal ("RFP")
for body armor for U.N. peacekeeping forces.  API submitted a bid to the U.N., with the
assistance of the U.N. Agent, in response to this RFP.

11.    In or around September 2001, in order to ensure that API submitted the lowest bid
for the 2001 U.N. body armor contract, the U.N. Agent instructed Bistrong and Subsidiary
Executive A that in addition to submitting a pricing sheet to the U.N. as part of API's bid to
supply body armor to the U.N., Bistrong and Subsidiary Executive A should also provide the
U.N. Agent with a signed, but otherwise blank, pricing sheet in case API's pricing had to be
revised after the bidding was closed.

12.    In or around September 2001, API, through the U.N. Agent, submitted a bid to
supply body armor to the U.N. and provided the U.N. Agent with a signed, but otherwise blank
pricing sheet, which the U.N. Agent filled in and submitted to the U.N. after learning from a
U.N. procurement official the prices included in the non-public bids submitted by the other
competitors for the contract.

13.    On or around September 27, 2001, the U.N. Agent sent an email to Bistrong's
company email account, attaching an internal U.N. procurement memo recommending that API
be awarded the 2001 U.N. body armor contract, and advising Bistrong to destroy the message
after reading it.

14.    On or around October 17, 2001, the U.N. awarded API the 2001 U.N. body armor
contract.  After receiving the award, Bistrong and Subsidiary Executive A caused API to pay a
sales commission to the U.N. Agent, believing that a portion of that money would be forwarded

on to the U.N. procurement official who provided the confidential, non-public bid information to the U.N. Agent.

15.    From in or around October 2001 through in or about February 2003, API performed the U.N. body armor contract.

16.    In or around February 2003, upon receiving notice from the U.N. Agent that the U.N. had issued another contract tender to supply U.N. peacekeeping forces with additional body armor, Bistrong sent an email to the U.N. Agent from his company email account asking the U.N. Agent how Armor could win that tender.

17.    In or around February 2003, the U.N. Agent replied that he could assist API in winning the contract and that the same rules would apply to the new tender as applied to the 2001 tender.

18.    In or around August 2003, API was awarded the 2003 U.N. body armor contract. API then paid a sales commission to the U.N. Agent.

19.    The total price of the goods sold by API under the 2001 and 2003 U.N. body armor contracts was approximately $6 million, resulting in a total profit to API of approximately $1 million.

20.    From in or around September 2001 through in or about 2006, Bistrong and Subsidiary Executive A caused API to pay the U.N. Agent more than $200,000 in commissions for the 2001 and 2003 U.N. contracts obtained by API, knowing that a portion of that money was to be passed on by the U.N. Agent to a U.N. procurement official to induce that official to provide non-public, inside information to the U.N. Agent and to cause the U.N. to award body armor contracts to API.

- 4 -

*Books and Records*

21.     From in or around 2001 through in or around 2006, Bistrong, Products Employee A, and others caused the Products Group to keep off Armor's books and records approximately $4.4 million in payments to agents and other third-party intermediaries (collectively, "the Products Group Agents") used by the Products Group to assist it in obtaining business from foreign government customers.  Specifically, Bistrong, Products Employee A, and others caused the Products Group to send to the end users, primarily government customers, an invoice that included a fee the Products Group would pay to the Products Group Agents – a so-called "pro-forma" invoice.  At the same time, Bistrong, Products Employee A, and others caused the Product Group to create a false invoice – a so-called "net" invoice – that would not contain the amount to be paid to the Products Group Agents.  Bistrong, Products Employee A, and others then caused the Products Group accounting department to enter the data from the false "net" invoices into Armor's books and records.

22.     As an issuer, Armor was required, among other things, to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.  Armor failed to properly account for the payments described above in its books, records, and accounts.

23.     As an issuer, Armor was also required, among other things, to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (a) transactions are executed in accordance with management's general or specific authorization; (b) transactions are recorded as necessary (i) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (ii) to maintain accountability for assets; (c) access to assets is permitted only in accordance with management's general or specific authorization; and (d) the

recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.  Armor failed to devise and maintain such a system of internal accounting controls.

## APPENDIX B

## CORPORATE COMPLIANCE PROGRAM

In order to address deficiencies in its internal controls, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-l, *et seq.*, and other applicable anti-corruption laws, Armor (the "Company") agrees, as a condition of this non-prosecution agreement, to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where appropriate, Armor agrees to adopt new or to modify existing internal controls, policies, and procedures within the Legacy Armor Operations in order to ensure that they maintain: (a) a system of internal accounting controls designed to ensure that the Legacy Armor Operations make and keep fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance code, standards, and procedures designed to detect and deter violations of the FCPA and other applicable anti-corruption laws. At a minimum, this should include, but not be limited to, the following elements:

1. Armor will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA, including its anti-bribery, books and records, and internal controls provisions, and other applicable foreign law counterparts (collectively, the "anti-corruption laws"), which policy shall be memorialized in a written compliance code.

2. Armor will ensure that its senior management provides strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws and its compliance code.

3. Armor will develop and promulgate compliance standards and procedures designed to reduce the prospect of violations of the anti-corruption laws and BAE Systems' compliance code and will take appropriate measures to encourage and support the observance of ethics and compliance standards and procedures against foreign bribery by personnel at all levels of the Company. These anti-corruption standards and procedures shall apply to all directors, officers, and employees of Armor and the Legacy Armor Operations and, where necessary and appropriate, outside parties acting on behalf of Armor or the Legacy Armor Operations in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners"), to the extent that agents and business partners may be employed under the Company's corporate policy. Armor shall notify all employees that compliance with the standards and procedures is the duty of individuals at all levels of the company. Such standards and procedures shall include policies governing:

    a.    gifts;
    b.    hospitality, entertainment, and expenses;
    c.    customer travel;
    d.    political contributions;
    e.    charitable donations and sponsorships;

      f.      facilitation payments; and

      g.     solicitation and extortion.

4.     Armor will develop these compliance standards and procedures, including internal controls, ethics, and compliance programs on the basis of a risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

5.     Armor shall review its anti-corruption compliance standards and procedures, including internal controls, ethics, and compliance programs, no less than annually, and update them as appropriate, taking into account relevant developments in the field and evolving international and industry standards, and update and adapt them as necessary to ensure their continued effectiveness.

6.     Armor will assign responsibility to one or more senior corporate executives of Armor, reporting to a senior official of BAE Systems, Inc., for the implementation and oversight of its anti-corruption policies, standards, and procedures. Such corporate official(s) shall have direct reporting obligations to independent monitoring bodies, including internal audit, BAE Systems, Inc.'s Board of Directors, or any appropriate committee of BAE Systems, Inc.'s Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

7.     Armor will ensure that Armor and the Legacy Armor Operations have a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts to ensure that they cannot be used for the purpose of foreign bribery or concealing such bribery.

8.     Armor will implement mechanisms designed to ensure that its anti-corruption policies, standards, and procedures are effectively communicated to all directors, officers, and employees of Armor and the Legacy Armor Operations, and, where appropriate, agents and business partners of Armor or the Legacy Armor Operations. These mechanisms shall include: (a) periodic training for all such directors and officers, and, where necessary and appropriate, employees, agents and business partners; and (b) annual certifications by all such directors, and officers, and, where necessary and appropriate, employees, agents, and business partners, certifying compliance with the training requirements.

9.     Armor will establish an effective system for:

      a.     Providing guidance and advice to directors, officers, and employees of Armor and the Legacy Armor Operations, and, where appropriate, agents and business partners of Armor and the Legacy Armor Operations, on complying with the Company's anti-corruption compliance policies, standards, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates;

- 2 -

b.      Internal and, where possible, confidential reporting by, and protection of, directors, officers, and employees of Armor and the Legacy Armor Operations, and, where appropriate, agents and business partners of Armor and the Legacy Armor Operations, not willing to violate professional standards or ethics under instructions or pressure from hierarchical superiors, as well as for directors, officers, and employees of Armor and the Legacy Armor Operations, and, where appropriate, agents and business partners of Armor and the Legacy Armor Operations, willing to report breaches of the law or professional standards or ethics concerning anti-corruption occurring within the Company, suspected criminal conduct, and/or violations of the compliance policies, standards, and procedures regarding the anti-corruption laws for directors, officers, and employees of Armor and the Legacy Armor Operations, and, where appropriate, agents and business partners of Armor and the Legacy Armor Operations; and

c.      Responding to such requests and undertaking appropriate action in response to such reports.

10.    Armor will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and BAE Systems' anti-corruption compliance code, and the Company's anti-corruption policies and procedures by directors, officers, and employees of Armor or the Legacy Armor Operations. Armor shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, ethics, and compliance program and making modifications necessary to ensure the program is effective.

11.    Armor will institute appropriate due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.      Properly documented risk-based due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners of Armor and the Legacy Armor Operations;

b.      Informing agents and business partners of Armor's and the Legacy Armor Operations' commitment to abiding by laws on the prohibitions against foreign bribery, and of Armor's and the Legacy Armor Operations' ethics and compliance standards and procedures and other measures for preventing and detecting such bribery; and

c.      Seeking a reciprocal commitment from agents and business partners.

12.    Where appropriate, Armor and the Legacy Armor Operations will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include: (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of anti-corruption laws, and regulations or representations and undertakings related to such matters.

13.     Armor will conduct periodic review and testing of the application of BAE Systems' compliance code to Armor and the Legacy Armor Operations and of the Company's, standards and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and BAE Systems' compliance code and the Company's standards and procedures, taking into account relevant developments in the field and evolving international and industry standards.

## APPENDIX C

## CORPORATE COMPLIANCE REPORTING

1.      Armor (as defined in the Agreement) agrees that it will report periodically, at no less than six-month intervals, in accordance with the schedule described in Paragraph 3 below, during the two-year term of this Agreement, to the Fraud Section of the Department of Justice ("this Office") regarding remediation and implementation of the compliance program and internal controls, policies, and procedures described in Appendix B.

2.      Should Armor discover credible evidence, not already reported to this Office, that questionable or corrupt payments or questionable or corrupt transfers of property or interests may have been offered, promised, paid, or authorized by Armor or the Legacy Armor Operations or person, or any entity or person working directly for Armor or the Legacy Armor Operations, or that related false books and records have been maintained, Armor shall promptly report such conduct to the Department.

3.      During the two-year term of this Agreement, Armor shall: (1) conduct an initial review and prepare an initial report, and (2) conduct and prepare two follow-up reviews and reports, as described below:

a.      Armor shall issue a written report within 180 calendar days of the signing of this Agreement setting forth a complete description of its remediation efforts to date, its proposals reasonably designed to improve the policies and procedures of Armor for ensuring compliance with the FCPA and other applicable anti-corruption laws, and the parameters of the subsequent reviews. The report shall be transmitted to Charles Duross (or his successor), Deputy Chief, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, N.W., Bond Building, Fourth Floor, Washington, D.C. 20530. Armor may extend the time period for issuance of the report with prior written approval of this Office.

b.      Armor shall undertake two follow-up reviews, incorporating any comments provided by this Office on its initial review and report, to further monitor and assess whether the policies and procedures of Armor are reasonably designed to detect and prevent violations of the FCPA and other applicable anti-corruption laws. Those reviews shall be transmitted to Charles Duross (or his successor), Deputy Chief, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Ave., N.W., Bond Building, Fourth Floor, Washington, D.C., 20530.

c.      The first follow-up review and report shall be completed by 180 days after the initial review. The second follow-up review and report shall be completed by 180 days after the completion of the first follow-up review.

d.      Armor may extend the time period for submission of the follow-up reports with prior written approval of this Office.